Good morning. Terry Kolke for Mr. Needles. If it pleases the Court, I'm ready to proceed. I'm going to limit my argument to the issue that I brought up in my brief, that Mr. Needles had an approved plan of operation. And since he had that approved plan of operation, he could not be found guilty of the crime of operating without an approved or reside or maintaining a residence without an approved plan of operation. Before I get to the facts of the case, I want to point out that the government has claimed that we waived, my client waived, that issue by failing to bring it up. And the first part of my argument is about whether or not that issue was waived. This trial was a stipulated facts bench trial. As it started, both sides stipulated to 24 facts in a four-page document. That starts the trial. Both sides said there are no factual disputes. Both sides then commenced closing argument. And the closing argument, because it's a bench trial, was unusual because it went back and forth, back and forth. But it's still, the entire trial transcript starts with three pages of stipulating to the facts and then about 40 pages of closing argument. My contention is, is that you cannot, you do not waive an issue because you don't bring it up in a closing argument. Yes, they did not bring it up in a closing argument. But the issue is, by pleading not guilty, you raise the issue of the sufficiency of the government's proof of each and every element of the crime. The government is never relieved of that burden. And just because in closing argument you do not bring it up, you don't waive it. It's a constitutional right. You don't waive it because somebody fails to bring it up. Let's assume you raised it. Why are they on the plan of operations? Because they took over from the site from, it was the McBrooms, wasn't it, or somebody like that? Yes. In the stipulated facts, let me get to that part. There are, it's very simple, it's very straightforward. I don't believe that there can be a logical argument to counter the stipulated facts. The stipulated facts are that Carlin McBroom was the sole owner, occupier, and operator from the late 90s to 2003. The facts are, in 2003, he obtained an approved plan. He died in January of 2003. Number nine of the stipulated facts are that Ed Needles and Joe McBroom, Joe McBroom is the son of Carlin, Ed and Joe succeeded Carlin McBroom as identified owners and operators of the Orion Mine. Since they succeeded, and I'll add the word, succeeded in interest as owners and operators, they succeeded in the entire interest of the Orion Mine. So why did they submit a new plan of operations, then? Two things. One, they wanted to modify it. They wanted to do, remove some trailers and do some reclamation work. They wanted to modify the plan and get an approval for a modification with a lower bond. But if I could add this, by them requesting a modification in what is called the proposed 2004 plan, by proposing a modification, in no way does that annul or revoke the 2003 approved plan. And, in fact, if you look at Exhibit B in the stipulated facts, Exhibit B is a 2007 mining inspection. And in that inspection, it notes that Mr. Needles states he doesn't care if they reject the 2004 proposal. He will live with the 2003 plan. So is there any regulation that says that in a situation like this, where somebody else takes over the mining claim, they also sub in on the plan of operations? There are no regulations. There's no case law. There's no rules. And my argument, as I put forth in my brief, is the regulations are absolutely silent on transfer. They're absolutely silent on how this gets transferred. If you look at 30 U.S.C. 26, locators' rights of possession, it does say that the locator, his heirs and assigns, his heirs and assigns have the exclusive right in possession. So the statutes assume that this is the case. So how is he – how is Mr. Needles either an heir or an assign? You know, I'm going to answer that, Your Honor, by sticking to the facts. That would be a good idea. We do not know how it happened. I cannot add things beyond my facts. We don't know how it happened. All we know is it did happen. Well, wait a minute. What's the evidence of it? Oh, number nine, Ed Needles and Joe McGroom succeeded Carla McGroom as identified owner and operator. As an heir or an assign? What does succeeded – what does succeeded mean? We don't know. All right. So you're construing that. He clearly wasn't an heir because he wasn't related to Mr. – Well, Joe McGroom certainly is an assign. Is he still on the plan of operation or the – I thought – He was out. Isn't it just Mr. Needles now? Well, in terms of the conviction, Joe McGroom was found not guilty because there was a stipulation that these three – these three trailers were all owned by Ed Needles. So the district court found Joe not guilty because the charge was simply the residences. And there was a stipulation that Joe McGroom did not own those residences, so he could not be guilty. Right. So how did Mr. Needles come to be able to put the trailers on the property? First of all, the trailers were there always. There's no change in place. They used to be owned by Carla McGroom? Yes. But it didn't go to his son? No, it didn't. Okay. That's weird.  What I'm suggesting – Don't you have the burden of establishing that there is some connection between Carla McGroom and Mr. Needles that gives Mr. Needles some entitlement? You're relying on error or a sign. Well, he's clearly not an error, and a sign implies that there's some formal assignment, some documentation of it. Succeeding somebody doesn't make them an assignee necessarily. It could just be succeeded in terms of chronological sequence. And I appreciate what Your Honor is suggesting, but I disagree that it is the defense burden. The burden is, first of all, on the prosecution to prove this element. But let me now combine Stipulation 1 with Stipulation 9. Stipulation 1 is Ed Needles and Joe McGroom share ownership of Orion Mine. They share ownership. However it happened, both sides stipulated that they own it. It is in the facts. Now, I understand that we are missing how that happened. We may be missing it, but it's clear. All right. I think we have a point. You don't have to belabor it. All right. Okay. And Doesn't the plan, the original plan of operation, though, refer to the operator as the McGrooms, correct? Yes, it did. It just said Carly McGroom. But the regulations completely leave out any mention. Regulations are silent as to transfer of operator, transfer of ownership, assigning. The regulations are completely silent. I assume that means the government has no interest in how these things get transferred. All they want to know is who the person is. In Number 9, it mentions that Ed Needles is Well, let me ask you, how could they enforce, you know, if he's not listed on the plan of operations, you know, there's part of the plan of operations provided at the end of the mining activity, there's a reclamation requirement, you know, to maintain, to restore the land, right? Yes. So how could they go after this sort of new person who's now operating? The regulations are, again, silent about that. The regulations are silent about what remedies they have. But again, if you look at So they would have to go against the McGrooms, right? Well Carly McGroom No, I'm referring to Number 9. It says, and it doesn't say how, but it says Ed Needles is an identified operator. So somewhere along the line, the Forest Service, it's not in the records, maybe there are other records, but they stipulated that Ed Needles is the identified operator. So the Forest Service must know. Okay. So just to cut to the chase on, I think, the question, if there was some reason to find a violation of the 2003 plan of operation, that fact stipulation is a judicial admission by Mr. Needles that he's on the hook? Well, okay. And, you know Is that what you're saying? No. No. I'm saying that that stipulation Because they did approve the proposed plan if he put up a bond and signed the form. Isn't that correct? I'm sorry. The Forest Service said it would approve the proposed, the 2004 modification if Mr. Needles would sign it and put up a bond. Isn't that correct? That's what they said. Yes. So he would then be on the plan of operation. He refused to do that. He did. And so he tried to revert to what Carl Carlin McBroom had by virtue of his approved plan, where he signed it. Correct. Okay. So the only way that Mr. Needles could get the benefit of the 2003 and be equally responsible as Mr. Carlin was, was either to be an error or an assigned under your theory. But you're not saying that the words that you're relying on in the stipulated facts actually would have put him in that position. Well, what I'm suggesting is it had to have been one of those, because the language says he's an owner and he succeeded. So an assigned under your theory would have put him in that position. So the answer to my question was, if we take your argument that the stipulated facts in the proceeding at least put Mr. Needles on the hook for whatever the bond amount was, although it wasn't his, he didn't post the bond, but the obligation to restore the property or whatever that flows with being party to a plan of operation. Yes. He was on the hook. Okay. All right. Thank you. Thank you. You're over. I think you're over time. Thank you. Thank you. May it please the Court, David Galtieri from the Department of Justice on behalf of the United States. I'd like to jump right in and stick with the topic that counsel raised and the number of issues that he raised. First, with regard to whose burden this is to establish this issue, whether there was authorization. The Lowry case says clearly that in a situation like this, where there is a general prohibition subject to exceptions, that the burden is on the defendant to establish the affirmative defense of having authorization or that no authorization was required. This regulation is crystal clear in the manner in which it's structured. It says that there's a flat prohibition against residence unless you can show that you have an approved plan of operations or special use authorization. It doesn't stop there, though, does it? When such authorization is required. That's right. What if no authorization is required? Right. And that language in the regulation refers to and clarifies in which – what type of authorization is required in which particular situation. If we're operating under Part 228, where a plan of operations is the appropriate authorization, that's the type of authorization required there. Or if it's under Part 251, a special use authorization, that's when it's required. That modification to the regulation came as a result of trying to clarify that – It suggests that the phrase, when such authorization is required, actually suggests there's a time when authorization is not required. It doesn't refer to parts at all. Well, what proceeds, it does refer to parts. It refers to an operating plan which is defined to mean a plan of operations under Part 228. And it refers to a Part 251 special use authorization, which is simply a crossing. If those words were missing, how would there be any more or less clarification as to what parts are referred to? Well, I think, first and foremost, the words are not missing. They're there. It's specified and it was amended. But the words are there suggests that there's a possibility that authorization is not required. There may be circumstances when authorization is not required, with what Mr. Evans referred to as situations where the level of mining and level of residence is so minimal that none would be required. But that's already provided for in the Part 228 regulations, that there's a notice of intent, which is, you know, which is the first level. The 228 make clear that there's times a notice of intent is not even required. So it's not automatic that you have to have a notice of intent. I mean, look at 228. There's a specific provision in 228 that says just that. 228a1, a notice of intent to operate is not required for, and then there's a series of subsections. That's correct. Okay. So there's a level at which no authorization, not even the level of a notice of intent, is required. As I read subpart B here, it suggests, well, you can't construct a residence unless it's authorized when authorization is required. What if authorization is not required? Well, I guess what I'm getting to is that the purpose of that language and the purpose of the amendment to that regulation was to clarify that, indeed, Part 261 does cross-reference Part 228 and that an operating plan is a form of authorization that would be required under 261.10b. It's that – it's perhaps not the best, the best. I have no understanding as to what that explanation does to explain why, when such authorization is required, why that phrase is there and why it shouldn't be taken to mean a recognition that sometimes authorization is not required. And if there is a case when authorization is not required, which 228 pretty clearly suggests there is such a case, then what is the application to be made of subpart B? What does subpart B prohibit in the instance where authorization for the mining activity is not required? Well, subpart B prohibits, it flatly prohibits residence on National Forest System lands, subject only to exceptions. Well, I guess it's not quite so clear, because I read this, you can't construct, reconstruct, blah, blah, blah, blah, unless authorized when such authorization is required. And I ask you, what does that mean if authorization is not required? Well, if – I guess simply put, if authorization is not required under the applicable regulations, which would be Part 251 or Part 258 – Part 228, authorization is not required. There is a structure within Part 228 to ascertain whether or not authorization is required. There is the notice of intent level. Okay, fine. You've acknowledged that there are circumstances where authorization is not required. And my question is, doesn't that suggest that B doesn't apply in a case where authorization is not required? B may not apply when authorization is not required under the strictures of the two sections that are cross-referenced, that are Part 251 and Part 228. I think getting back to this case, it was stipulated at trial that authorization was required. Karlyn McBroom's plan of operations was on file and had been approved. Mr. Needles and Mr. McBroom came along afterward, proposed their own plan to substitute their own name, and said, this is the same as the plan you already approved for Karlyn McBroom. So they acknowledged, and in fact stipulated in paragraph 6 of the stipulation, that authorization was required here. So this case is not even, you know, remotely one of the closed cases where it may not be required. It clearly is. What is also clear is that this argument was waived. You will search the transcript in vain, not just an oral argument. You will search the record in the district court in vain for any argument that they were authorized by Karlyn McBroom's plan. In fact, while this appeal has been pending and in opposition to a government motion to enforce the court's judgment, they argued we shouldn't be collaterally stopped from arguing that we're authorized by the 2003 plan, even though that issue was never raised or decided. Well, it's a legal question. We could get to it if we want. That's right. But I just wanted to make clear. So he's arguing, as I understand his argument, as a matter of law, we not only did we succeed to the claim, we succeeded in by that, we also stepped in as the operator under the plan. Well, and I think Lowry in other cases established, you know, his response is that it was the government's burden to show that it was required. This statute sets up an exception to a prohibition. That is the defendant's burden. The Lowry case and other cases make that clear. Well, assuming it's his burden, what's your response to his argument? Well, the argument, I think his primary argument is stipulated fact — well, there are two responses. Stipulated fact 9, saying Ed Needles and Joe McBroom succeeded Carlin McBroom as identified owners and operators of the Orion Mine. That, of course, goes on to say in the same paragraph, in April 2004, they submitted a proposed plan of operations. When this provision — when this stipulation paragraph says succeeded, succeeded simply means came later in time. It doesn't say succeeded in interest. It doesn't say that they're a successor. Black's Law Dictionary doesn't have a definition for succeeded. Succeeded would take its common meaning as coming later in time. That's all it means. But — Can an operator under a plan of operations transfer his, you know, his operations to somebody else? He could, subject to Forest Service approval, and we — Is there a regulation for that? There is a modification provision in the regulations. They could submit a proposed modification, as all of these cases show. There are — there's a back-and-forth with the Forest Service to try to get to a final plan of operations. They could propose to modify it. So to transfer, to modify the plan of operations, what does one have to do? They would have to submit a proposed modification to the plan of operations to the Forest Service for eventual Forest Service approval. So there would be the full back-and-forth negotiation that goes on in establishing that. So could — well, just before — let me just finish up. So could they just submit a — we propose to modify the plan, the existing plan of operations. We'll adhere to all conditions. We just want to substitute — Right. — the name of the individual, the operator. Well, here, for their argument to prevail, Carlin McBroom would have had to do all that. He didn't. There's no record of him trying to add needles to his plan of operations. There are many spots in that form where you could identify who's associated with this claim as assigns and co-claimants and co-operators, multiple categories. Ed Needles' name appears nowhere on that plan of operations. Carlin McBroom, as has been acknowledged, is the sole identified operator. So Mr. Needles just couldn't come along afterwards and say, well, I want to modify that plan because I'm going to operate the mine? He could, and he did. He proposed his own plan of operations. And what is being lost in the mix here is that these are new claims. Ed Needles located, after Carlin McBroom's death, on April 26th, new claims. They bear four different claim numbers than Carlin McBroom's claims. Carlin McBroom's claims lapsed. So this whole argument that he succeeded in a legal way has some legal interest in Carlin McBroom's claim. There's no predicate for it whatsoever. I think counsel here acknowledged there's simply no facts. We don't know how they ever came to be associated with them. The fact is, he's not associated with them. And the, if I can just finish my thought, the record on appeal under Federal Rule of Appellate Procedure 10A, the record on appeal includes the information that we cited in our brief, identifying that these are new claims. So the predicate for this notion that somehow a plan of operations could somehow be transferred when the claim is transferred is missing, because the claim was never transferred. It's a brand-new claim. It's a brand-new proposed plan of operations. And there was a long back and forth as to whether or not they would satisfy the bond requirement. And their refusal to pay that $1,098 and get an approved plan is the reason that we're here. Okay. Thank you. Thank you. I don't know if you've used all your time, but you can have a minute to ---- Thank you very much. I'll be very brief and touch on a number of matters. Counsel is incorrect when he says that Mr. Needles needed authorization to, after McBroom's death, to add his name as the operator. There's no regulations for that. The only regulation is 2284C, which says the operator has to give his name to the agency. That's it. The agency has left this to the operators. There's no requirement. Well, the operators applied for new claims, filed a new plan of operation. That is not ---- first of all, it's not in the trial record. It is not part of the stipulated facts. And the ---- there is a document in ---- that came into pretrial, that came into the pretrial motions that mentioned something like he was saying, that there were new claims. But that, first of all, is not before this Court. It's not part of the trial record. Second, those are ---- You're asking us to use our imagination with regard to successor. Okay. I mean, let's face the reality of it. Apparently, your client treated this as something that you needed to apply for a new plan of operation. Okay. He may have. He did. He did go out and make a claim on four other pieces of ---- four other claims. But that is not what we're talking about. Based on the stipulated facts, we are talking about the Orion Mine, defined as the Orion Mine, if you look closely at the stipulated facts, the Orion Mine is defined as what Carlin owned. Okay. I'll focus just on that. Was that ---- was it the Orion Mine for which he applied for a new or filed a new plan of operations? Yes. Because he took the exact Carlin form, the exact Carlin form, and he simply took the exact Carlin form, and he simply put a face page on it, and he sent in the exact Carlin form. It was very clear he was talking about the exact Carlin form. And if I can add one thing before I end here, even the Forest Service acknowledged that this was the same property, the same claim, because in one of their letters, which is in the file, they say that ---- this is actually a stipulated fact ---- that the reclamation bond posted by the Eastern Oregon Miners Association that was on Carlin's not transferred, it still applies. It still applies. So the Forest Service recognized it's the same property, the same claim, because they applied the reclamation bond to Ed Needles. Okay. Thank you. Thank you. All right. The Needles case is submitted.
judges: Fisher, Paez, Clifton